# In the United States Court of Federal Claims

|  |  |
|---|---|
| SQUARE ONE ARMORING SERVICES COMPANY, | |
| Plaintiff, | Nos. 16-cv-124C, 16-cv-263C |
| v. | Filed: February 22, 2021 |
| THE UNITED STATES, | |
| Defendant. | |

*David J. Habib, Jr.*, Law Office of David J. Habib, Westlake Village, California for Plaintiff.

*James W. Poirier*, United States Department of Justice, Civil Division, Washington, D.C. for Defendant. With him on the briefs are *Jefferey Bossert Clark*, Assistant Attorney General, Civil Division, *Robert E. Kirschman, Jr.*, Director, Commercial Litigation, *Allison Kidd-Miller*, Assistant Director, Commercial Litigation, Washington, D.C.

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's second motion to amend its Answer. *See generally* Defendant's Motion for Leave to File Defendant's Second Amended Answer to the Third Amended Complaint, and Defendant's Counterclaims, Set-off and Affirmative Defenses (ECF No. 149) (Def. Mot.); [Proposed] Amended Answer (ECF No. 149-1) (Proposed Am. Answer); Defendant's Reply in Support of Defendant's Motion for Leave to File Defendant's Second Amended Answer to the Third Amended Complaint, and Defendant's Counterclaims, Set-off and Affirmative Defenses (ECF No. 153) (Def. Reply). Specifically, Defendant moves to amend its Answer to include (1) an affirmative defense based on the statute of limitations, (2) a new counterclaim for common law fraud in connection with the submission of four purportedly false invoices on August 31, 2009, (3) a set-off based upon a final decision of the contracting

1

officer, dated October 13, 2020, and (4) an affirmative defense of prior material breach based upon the same allegations that support Defendant's common law fraud counterclaim.  Def. Mot. at 1.

Plaintiff opposes the motion because (1) the amendments are futile (Pl. Resp. at 4-7), (2) the amendments were made in bad faith (Pl. Resp. at 7-8), (3) the amendments prejudice the Plaintiff (Pl. Resp. at 8), and (4) the amendments were brought with undue delay (Pl. Resp. at 2-4).  *See* Plaintiff's Opposition to Motion for Leave to File Plaintiff's Defendant's Second Amended Answer to the Third Amended Complaint, and Defendant's Counterclaims, Set-off and Affirmative Defenses (ECF No. 150) (Pl. Resp.).[1]

This Court has considered each of the parties' filings and arguments.  For the reasons explained below, Defendant's Motion for Leave to File Defendant's Second Amended Answer is **GRANTED**.

## BACKGROUND

This dispute has a long litigation history spanning over four years.  The action arises out of Contract No. SAQMMA07D0004 (DOS Contract), an August 8, 2007, indefinite delivery/indefinite quantity (IDIQ) contract between Plaintiff and Department of State (DOS) for the provision of armored vehicles for use by U.S. military personnel and dignitaries.  *See* Third Amended Complaint (ECF No. 52) (TAC) ¶¶ 3-4; *see also Square One Armoring Services Company v. USA*, 16-cv-263, (ECF No. 25-2) (DOS Contract).  The DOS Contract had a term of one base year plus four option years, with the final option year ending on August 7, 2012 and with

---

[1] Plaintiff's opposition focuses on Defendant's common law fraud counterclaim.  *See generally* Pl. Resp. at 2-8.  Plaintiff does not appear to oppose the addition of affirmative defenses of statute of limitations or set-off based on the October 13, 2020 contracting officer's final decision.  *See* Proposed Am. Answer ¶¶ 119-21.  Although Plaintiff's opposition does not specifically address Defendant's proposed affirmative defense of prior material breach, the Court construes Plaintiff's opposition as objecting to the addition of this defense because Defendant's affirmative defense of prior material breach is dependent on the same facts as the alleged common law fraud outlined in Defendant's Second Proposed Counterclaim.  *See id.*

2

an estimated value of $157,000,000.  TAC ¶ 6.  However, DOS continued issuing purchase orders

through September of 2013, with the last vehicle being delivered in May of 2015.  *Id*. ¶ 6.  The

DOS Contract required Plaintiff to provide various configurations of armoring systems of ten (10)

specific vehicle groups each identified by a separate Contract Line Item Number (CLIN).  *Id*. ¶ 4.

The DOS Contract provided that DOS would pay a per unit, fixed price for each CLIN deliverable.

*Id*. ¶ 5.  The DOS Contract included two (2) armoring standards, Levels C and D, which were to

be applied to the specific vehicle groups.  *Id*. ¶ 12.  The Level C and D specifications were

described in a classified portion of the DOS Contract's Statement of Work.  *Id*.  Level D armoring

is generally more extensive than Level C armoring and thus is generally more expensive than Level

C armoring.  *See generally* DOS Contract.

Under the DOS Contract, the Government could supply the vehicles for armoring, in which

case the vehicles were considered Government-Furnished Equipment (GFE); alternatively, the

Government could direct the contractor to purchase the vehicles before armoring them.  *See* DOS

Contract at 20.  The DOS Contract also included a "Note" stating that Square One's Overhead and

Profit on vehicles it provides should be included in the fixed price for armoring those vehicles.

TAC ¶ 5.[2]

---

[2] The Note states in full:

"Note: Vehicles purchased by the contractor for armoring under the required contract shall
be invoiced to the Government at actual cost, inclusive of all associated dealer charges but
with no markup for contractor overhead, profit or other fee or charge.  Any such markup
shall be included in the contractor's fixed price for armoring the vehicles."

DOS Contract at 7, 10, 13, 16, 19.  The parties dispute whether the contract's prohibition of
"overhead, profit or other fee or charge[s]" applies to any vehicle supplied by Square One under
the contract or just the Chevrolet Suburbans supplied under CLINS 8 and 10.  *See* TAC ¶ 4 ("[T]he
Contract provided that plaintiff could be called upon to supply two models identified at CLINs 8
and 10, i.e., Chevrolet Suburbans."); Defendant's Answer to the Third Amended Complaint (ECF

Plaintiff alleges that between 2007 and 2013, DOS issued various work orders for work not provided for in the DOS Contract. *Id.* ¶¶ 7, 15-22.  In September 2014, Square One submitted a request for equitable adjustment (REA) to the contracting officer that, based on the presence of a certification, was treated as a certified claim. *Id.* ¶¶ 8, 24.  Square One's certified claim sought $17,756,971.75 for alleged constructive changes to the DOS Contract that required additional armoring work. *Id.* ¶¶ 8, 24.  These alleged changes included the following constructive change orders (CCOs):

> CCO#001, Blast Mitigation and Additional Ballistic Requirements; CCO#002, Additional Welding on Perimeter, Door Flat Armor Panels; CCO#003, Door Flat Armor Panels; CCO#004, Windshield and Backlight Straps; CCO#005, Blast Shield; CCO#006, C Type Beam on Pillars and Reinforcements; CCO#007, Roof Overlap Welding Reinforcement; CCO#008, Channel Reinforcements; CCO#009, Blast Validation Testing; CCO#010, Level D Swing Door Glass On All SUVs; CCO#011, Replacement of OEM Door Handles on Large Sedans (Cadillacs); CCO#012, Map Lights (Cadillacs); CCO#14, Quality Processes; CCO# 15, Paint Increase; . . . CCO#017, Storage Overhead Costs and Fees; CCO#018, Change of Armor Design Due to AVICS; CCO#019, Tooling Costs for New Models Outside the Contract; CCO#020, Material Testing (Ballistic Certification).

*Id.* ¶ 21.

On May 1, 2015, the contracting officer denied the certified REA and asserted a "Government Demand for Payment" of $5,223,970.82, alleging the "Note" described above applied to all vehicles supplied by Square One under the DOS Contract and not just the Chevrolet Suburbans described in CLINs 8 and 10.  *See id.* ¶¶ 8, 24.

On January 27, 2016, Plaintiff filed suit in this Court seeking $17,756,971.75 for various constructive changes previously outlined in Square One's certified REA for alleged additional armoring work.  *See generally* Complaint (ECF No. 1) (Compl.).  However, Plaintiff's initial

---

No. 55) ¶ 7 ("[T]he Note applied not only to CLIN 8 and 10 but the Note applied to all vehicles purchased by the contractor.").

Complaint did not contest the debt for overpayment on contractor-acquired vehicles.[3]  On May 30, 2016, after Defendant had moved for a more definite statement, Plaintiff filed an amended complaint to address various formatting errors included in Square One's original Complaint.  *See generally* Defendant's Motion for a More Definite Statement (ECF No. 10) (arguing Square One's original Complaint contained "numerous, overly-detailed and largely unnumbered paragraphs"); First Amended Complaint (ECF No. 13) (FAC).  In addition to the $17,756,971.75 demanded in Plaintiff's certified REA, the First Amended Complaint also challenged a $5.2 million debt assessment, which DOS had levied against Square One for alleged overcharges.  FAC ¶¶ 3, 8, 73.

On June 22, 2016, Defendant moved to dismiss Plaintiff's First Amended Complaint on the basis that the contracting officer had not issued a final decision regarding some of the allegations in Plaintiff's First Amended Complaint.  *See* Defendant's Motion for Partial Dismissal and for Order to Show Cause (ECF No. 16).  On November 16, 2016, during a hearing on Defendant's Motion to Dismiss, Plaintiff's then-counsel[4] indicated it had not yet submitted a certified claim to the contracting officer for part of its First Amended Complaint.  *See* November 16, 2016 Transcript (ECF No. 26) at 3:21-7:8.  Subsequently, the previous judge overseeing this action ordered Plaintiff to amend its Complaint for a second time to resolve the issues noted in Defendant's First Motion to Dismiss.  *See* November 16, 2016 Order (ECF No. 24).  During the

---

[3] Plaintiff filed a separate, related action on February 25, 2016 alleging, among other things, a violation of the Administrative Procedures Act with respect to the administrative review of the debt pursuant to 22 C.F.R. § 34.9.  *See Square One Armoring Services Company v. USA*, 16-cv-263, Complaint, ECF No. 1 ¶¶ 12, 85.  On August 25, 2016, the cases were consolidated because each action concerned "the same contract, same set of facts, and the same Contracting Officer's final decision."  *See* Order Consolidating Proceedings (ECF No. 22).

[4] *See* Plaintiff's Consented Motion to Substitute Attorney of Record (ECF No. 48).

hearing, the Court stayed discovery until Plaintiff amended its Complaint.  *See* November 16, 2016 Transcript at 20:8-12.

On March 3, 2017, Square One submitted a second certified claim "adding $1,279,841.88, or, in the alternative, $3,471,351.51, in costs based on three additional alleged constructive change orders: CCO#21 & 21A [mis-application of the above-mentioned "Note"], CCO#22 (additional Storage Charges), and CCO#23 (Temporary Import Bonds)."  TAC ¶ 25.  "[DOS] denied this Claim on November 21, 2017."  *See id*.

On December 26, 2017, Plaintiff filed its Second Amended Complaint.  *See* Second Amended Complaint (ECF No. 46).  Shortly thereafter, for reasons not explained on the record, Plaintiff filed its Third Amended Complaint.  *See* TAC (filed January 12, 2018).  The Third Amended Complaint included three (3) counts: Count I, Breach of Contract/Constructive Change Orders (TAC ¶¶ 26-34); Count II, Breach of the Duty of Good Faith and Fair Dealing (TAC ¶¶ 35-41); and Count III, [Breach of] Implied in Fact Contract (TAC ¶¶ 42-47).

On February 15, 2018, Defendant filed its initial Answer, which did not include a counterclaim.  *See* Defendant's Answer to the Third Amended Complaint (ECF No. 55).  On August 29, 2018, Defendant amended its Answer to the Third Amended Complaint to add a counterclaim for overpayment in the amount of $4,943,349.82.  *See* Defendant's First Motion for Leave to Amend Defendant's Answer in Order to Assert a Counterclaim for Overpayment (ECF No. 66); Order Granting Defendant Leave to Amend Answer (ECF No. 70); (Defendant's First Amended Answer to the Third Amended Complaint, and Defendant's Counterclaim (ECF No. 71) (First Am. Answer).  In its Counterclaim for overpayment, Defendant alleges that Plaintiff repeatedly charged DOS in excess of the "actual cost, inclusive of associated dealer charges" when Plaintiff purchased vehicles for armoring under the DOS Contract.  First Am. Answer ¶¶ 55-57.

On February 27, 2020, this case was transferred to the undersigned judge.  (ECF No. 121.)

In July of 2020, Defendant filed a motion to re-depose Ms. Guillen-Ramos, and that motion previewed many of the issues outlined in Defendant's Proposed Counterclaim.  *See* Defendant's Motion for Leave to Take a Second, Limited Deposition of Ms. Gladys Guillen-Ramos (ECF No. 125) (Def. Mot. Second Dep. of Guillen-Ramos); *see also* Defendant's Reply in Support of Motion for Leave to Take a Second, Limited Deposition of Ms. Gladys Guillen-Ramos (ECF No. 139) (Def. Reply Second Dep. of Guillen-Ramos).[5]   Relevant to the pending motion to amend, Defendant sought to re-depose Ms. Guillen-Ramos based on Plaintiff's July 22, 2020 production of documents which included "four 'inspection packets' for jobs 438, 439, 440 and 441" as well as documents related to "job no. 450."  *See* Def. Mot. Second Dep. of Guillen-Ramos at 1, 6.  In that motion, Defendant asserted that, although it previously had access to the inspection packets for jobs 438-441, additional information relating to job 450 would explain why Square One and Mr. Motley, the contracting officer representative (COR) for the DOS Contract, took an unorthodox approach to invoicing for jobs 438-441.  *See* Def. Reply Second Dep. of Guillen-Ramos at 13-14; Def. Mot. Second Dep. of Guillen-Ramos at 1-3.  According to Defendant, the June 22, 2020 production supports an implication that Mr. Motley and Square One may have had a practice of trading favors.  *See* Def. Reply Second Dep. of Guillen-Ramos at 14 n.8.  In that

---

[5] The parties engaged in several discovery disputes, which have contributed to prolonging discovery in this case.  *See e.g.*, Defendant's Motion for a Scheduling Conference (ECF No. 72) at 2-4 (informing the Court of its position that classified material may be necessary to address the disputes in this case); Defendant's Motion for Leave to File Interrogatories Numbered One Through Five (ECF No. 74); Plaintiff's Motion for Leave to File Its Special Interrogatory Number 4 (ECF No. 75); November 29, 2018 Order (ECF No. 87) (finding that the case requires counsel to review classified material and directing Plaintiff's counsel to obtain the necessary security clearance or retain counsel who possesses the necessary clearance); Motion for Order Compelling Defendant to Appear for Rule 30(b)(6) Deposition; Request for Sanctions; Declaration of David J. Habib, Jr. (ECF No. 126) Defendant's Motion to Compel Production of Certain Design Records and Certain Accounting Reports (ECF No. 156).

motion, Defendant also insinuated that Mr. Motley may have allowed Square One to charge DOS Level D prices for jobs 438-441, in exchange for Square One sending the vehicle related to job 450 to Mr. Motley and his wife. *See* Def. Mot. Second Dep. of Guillen-Ramos at 2-4, 8; Def. Reply Second Dep. of Guillen-Ramos at 13 n.7, 14 n.8.

Plaintiff responded that it provided the email relating to the four invoices to Defendant in October 2018. *See* Opposition to Defendant's Motion for Leave to Take Second Deposition of Gladys Guillen-Ramos; Declarations of Martin Cardenal, Gladys Guillen, and David J. Habib, Jr. (ECF No. 131) at 3-4. Plaintiff also asserted that, although Mr. Motley's methods were unorthodox, there is no evidence of impropriety on the part of Square One. *Id*. at 5. In its Sur-Reply, Plaintiff attached a declaration from Ms. Guillen-Ramos. Sur Reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Leave to Take 2nd Deposition of Gladys Guillen; Declarations of David J. Habib, Jr., and Gladys Guillen (ECF No. 144) at 6-18. In her declaration Ms. Guillen-Ramos explained that, contrary to Mr. Quintana's 2014 testimony (discussed *infra*), jobs 438-441 were armored pursuant to "Level C standards applicable to Square One's 'GSA contract.'" *Id*. 6-7 (paragraphs 3-4 of Ms. Guillen-Ramos's Declaration). She stated that this information was accurately communicated to DOS personnel when Square One initially invoiced for these jobs, but that Mr. Motley instructed Square One to void the old invoices and submit revised invoices pursuant to the DOS Contract which had higher priced armoring requirements. *Id*. (paragraphs 4 and 6 of Ms. Guillen-Ramos's Declaration). Ms. Guillen-Ramos stated that Square One and Mr. Motley made an agreement whereby Square One would hold the excess payment for jobs 438-441 in trust. *Id*. (paragraph 7 of Ms. Guillen-Ramos's Declaration). According to Ms. Guillen-Ramos, Mr. Motley instructed Square One to use the excess payment to

purchase, among other things, the vehicle identified in job 450.  *Id*. at 8 (paragraph 9 of Ms. Guillen-Ramos's Declaration).

On August 14, 2020, this Court held a hearing to address the parties' remaining discovery disputes.  During the hearing, Defendant informed the Court that it was working with the Department of Justice Civil Frauds Section to determine whether to bring a claim against Plaintiff sounding in fraud.  *See* August 14, 2020 Transcript at 16:11-23, 23:10-19 (ECF No. 148).  The Court denied Defendant's motion to re-depose Ms. Guillen-Ramos and set a schedule for discovery.  *See* August 14, 2020 Order (ECF No. 145).

On October 20, 2020, Defendant moved to amend its Answer.  *See generally* Def. Mot.; Proposed Am. Answer.  In pertinent part, Defendant's Proposed Amended Answer to the Third Amended Complaint would add a counterclaim and an affirmative defense of prior material breach based on common law fraud.  *See* Proposed Am. Answer ¶¶ 66-110 (common law fraud counterclaim or second counterclaim), 119-121 (prior material breach affirmative defense). [6]  The common law fraud counterclaim alleges that, on August 31, 2009, Square One knowingly submitted four false invoices.  *Id*. ¶ 69.  According to Defendant, Square One armored four vehicles pursuant to a GSA contract numbered GS07F0303J (GSA Contract) under which DOS routinely purchased vehicles.  *Id*. ¶ 71.  The four armoring jobs performed on these four vehicles were referenced as jobs 438, 439, 440, and 441, respectively.  *Id*.  In September 2008, Square One submitted invoices to the United States for jobs 438-441.  *Id.* ¶ 75.  These invoices cited the GSA Contract, and the price for each job stated on each invoice was $50,940.  *Id*.  The United States did not pay these four invoices.  *Id*.  According to Defendant, on August 31, 2009, Square One

---

[6] The Court refers to Defendant's Proposed Amended Answer generally as Defendant's Proposed Counterclaim.

again submitted invoices for jobs 438, 439, 440, and 441 but this time the invoices misleadingly cited to the DOS Contract, even though these jobs were not armored in accordance with the specifications of that contract.  *Id*. ¶¶ 73, 77.  Moreover, Defendant alleges that the August 31, 2009 invoices requested $82,357.41 for each job and therefore, each of the four invoices fraudulently sought $31,417.41, in excess of the "true" price for each such job.  *Id*.  In total, the four invoices sought $125,669.64 which, Defendant contends, "Square One had no legal entitlement to be paid."  *Id*.  In September 2009, the DOS finance office paid to Square One the amount of $82,357.41 for each of jobs 438, 439, 440, and 441.  *Id*. ¶ 80.

Additionally, Defendant alleges that Square One participated in a fraudulent scheme with Mr. Motley, which, Defendant asserts, allegedly helped to conceal the overbilling for jobs 438-441.  *Id*. ¶¶ 81-105.  Defendant suggests that Mr. Motley may have approved the invoices for jobs 438, 439, 440, and 441, in exchange for Square One supplying Mr. Motley with a Chevrolet Suburban.  *Id*. ¶¶ 101-04.  According to Defendant, on March 2, 2010, Mr. Martin Cardenal, then-Sales Manager at Square One,[7] began discussing the purchase of a used 2007-08 Chevrolet with Mr. Motley.  *Id*. ¶¶ 87-88.  In late-May 2010, Square One purchased a Chevrolet Suburban with VIN 3GNFK16Y78G179658, which Defendant alleges was fraudulently titled to Car Collision Center LLC.  *Id*. ¶¶ 95-98.  Defendant asserts that on August 27, 2010, despite never receiving a purchase order from DOS for this vehicle, "Square One generated a fake invoice for the Suburban with VIN 3GNFK16Y78G179658 [which] was purportedly for 'Order No. 450' and sought payment of $45,485 . . . ."  *Id*. ¶¶ 99-100.  However, unlike Square One's customary invoicing practices, the invoice for job 450 was missing a contract number, purchase order number, and

---

[7] Mr. Cardenal is currently the President and an owner of Square One.  Proposed Am. Answer ¶ 87.

requisition order number.  *Id.*  Instead, in this missing information's place, the invoice stated, "Rick Motley."  *Id.* ¶¶ 100-01.[8]  According to Defendant, DOS never received the Chevrolet Suburban associated with job 450.  *Id.* ¶ 102.  Instead, on October 5, 2011, title to the Chevrolet Suburban allegedly passed from Car Collision Center LLC to Ms. Estella Louise Motley, the wife of Mr. Motley.  *Id.* ¶¶ 102-04.[9]  Almost a year after Ms. Motley obtained title for the Chevrolet Suburban, Square One came under pressure to explain the transaction involving the Chevrolet Suburban but never informed the contracting officer of the suspicious circumstances surrounding job 450.  *Id.* ¶¶ 105-07.  According to Defendant, Square One's silence purportedly advanced a scheme whereby Mr. Motley received title to the Suburban in job 450 and Square One was paid for work it did not perform on jobs 438, 439, 440, and 441.  *Id.* ¶ 107.

Defendant asserts that the allegedly fraudulent invoices were further concealed in January 2014, by Mr. Alvaro Quintana, whom Defendant alleges made false statements about the invoices for jobs 438, 439, 440, and 441 in a sworn interview with government investigators.  *Id.* ¶ 108.  According to Defendant, when Mr. Quintana was deposed for the case at bar in August of 2020, he recanted the statements he made in January 2014 and did not explain his earlier testimony.  *Id.* ¶ 109.

---

[8] Square One allegedly generated, but did not send to DOS, a second irregular invoice for job 450. Proposed Am. Answer ¶ 101.

[9] In 2017, Mr. Ratcliffe, the owner of Car Collision Center, and Mr. Motley pleaded guilty to acting together to steal a dozen different Chevrolet Suburbans from DOS during the period of 2011 through 2015.  *See* Def. Mot. Second Dep. of Guillen-Ramos at 6.  However, no charges were ever brought against Mr. Motley for the alleged theft of the Chevrolet Suburban involved in job 450. *Id.*

Fact discovery in this matter is ongoing but is currently set to close on April 5, 2021. *See* January 11, 2021 Sixth Amended Scheduling Order (ECF No. 155).[10]

DISCUSSION

Rule 15 of the Rules of the United States Court of Federal Claims (RCFC or Rule(s)), permits a party to amend its pleadings "with the opposing party's written consent or the court's leave," and further states that the court should "freely give leave when justice so requires." RCFC 15(a)(2). It is well established that the grant or denial of an opportunity to amend pleadings is within the discretion of the trial court. *Meyer Grp., Ltd. v. United States*, 115 Fed. Cl. 645, 649 (2014) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971)). The court will ordinarily grant such leave absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies . . . , undue prejudice to the opposing party . . . , or futility of amendment." *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403-04 (Fed. Cir. 1989) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff opposes Defendant's Proposed Counterclaim on the grounds that: (1) the counterclaim is futile (Pl. Resp. at 4-7), and (2) the counterclaim was brought with undue delay, in bad faith, and unduly prejudices Plaintiff (Pl. Resp. at 2-4, 7-8). For the reasons discussed below, each of these arguments is unavailing.

I.   Defendant's Common Law Fraud Counterclaim Is Not Futile.

Plaintiff argues that Defendant's Proposed Counterclaim is futile for three reasons. Pl. Resp. at 4-7. First, Plaintiff argues that Defendant failed to adequately plead the common law

---

[10] The Court established a discovery schedule on April 20, 2018. *See* Scheduling Order (ECF No. 58). Subsequently, the Court granted six amendments to the schedule. *See* January 23, 2019 First Amended Scheduling Order (ECF No. 92); June 18, 2019 Second Amended Scheduling Order (ECF No. 102); March 26, 2020 Third Amended Scheduling Order (ECF No. 124); August 3, 2020 Forth Amended Scheduling Order (ECF No. 138); August 14, 2020 Fifth Amended Scheduling Order (ECF No. 145).

fraud elements of scienter, justifiable reliance, or injury. *Id*. at 7.  Therefore, Plaintiff asserts that Defendant's proposed counterclaim fails to meet Rule 9(b)'s pleading requirements. *Id*.  To support this assertion, Plaintiff states that there was no justifiable reliance because the invoices were prepared at the direction of DOS and its agents. *Id*. at 7.  Plaintiff also contends that Defendant cannot prove "intent to deceive," highlighting that even the contracting officer assumed that Plaintiff submitted the allegedly fraudulent invoices in "good faith" for purposes of the contracting officer's October 13, 2020 final decision. *Id*. at 7.  Additionally, Plaintiff contends that the "injury" element to common law fraud is disproved by Plaintiff's internal accounting. *Id*. at 7.  Second, Plaintiff argues that Defendant's counterclaims are barred by the statute of limitations because the documents Defendant relies upon for its new proposed claims were submitted to the Department of State Office of Inspector General and the Department of Justice in 2008 and 2009. *Id*. at 5-6.  Third, Plaintiff argues that Defendant's common law fraud counterclaim is a compulsory counterclaim and that Defendant waived this counterclaim when Defendant failed to file it in response to the Plaintiff's Third Amended Complaint. *Id*. at 5.

Each of Plaintiff's contentions are without merit.

A.  Defendant Has Plausibly Alleged the Elements of Common Law Fraud.

"When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006) (citations omitted).  To succeed on the merits, Defendant must ultimately prove the elements of its common law fraud claim by clear and convincing evidence. *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 284 (2018).  However, "for purposes of reviewing defendant's motion for leave to amend its answer, the salient

13

inquiry is not whether defendant is likely to prevail on the merits, but whether the claim added by the amendment would not withstand a motion to dismiss." *Id.* (internal quotations and citations omitted). To survive a motion to dismiss, pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must also establish "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678. Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 555, 557).

Furthermore, under Rule 9(b), allegations of fraud "must [be] state[d] with particularity [as to] the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of person's may be alleged generally." RCFC 9(b); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). "The purpose of pleading fraud with particularity is to allow formulation of a responsive pleading and guard parties against baseless claims . . . . Fraud allegations should contain references to time, place, and manner of the fraud." *Hanover Ins. Co. v. United States*, 134 Fed. Cl. 51, 66 (2017) (internal quotations and citations omitted).

To proceed with its common law fraud counterclaim, Defendant must adequately plead each of the five elements of common law fraud:

> (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived resulting from reliance on the misrepresentation.

*Unigene Lab., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011) (quoting *In re*

*Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000)).[11]

Accepting the allegations in Defendant's Proposed Counterclaim as true, Defendant has

sufficiently addressed each of the five elements of common law fraud and has done so with the

particularity required by Rule 9(b).

---

[11]     Precedent in this court relating to common law fraud is sparse.  Therefore, this Court relies on decisions discussing similar concepts in the context of the False Claims Act (31 U.S.C. § 3729 *et seq.*) (FCA) and Forfeiture of Fraudulent Claims Act (28 U.S.C. § 2514) (FFCA).  However, it is important to note at the outset, that the Court does not intend to conflate these causes of action with common law fraud.

The elements for common law fraud are often confused with those arising under the Forfeiture of Fraudulent Claims Act (FFCA).  *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007).  Though distinct, there is substantial overlap.  Indeed, under one line of cases, the elements are identical as between common law fraud and the FFCA.  *See, e.g.*, *Crane Helicopter Servs., Inc.*, 45 Fed. Cl. 410, 430 n.25 (1999) (citing *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 128 (1997); *Colorado State Bank of Walsh v. United States*, 18 Cl. Ct. 611, 628-29 (1989), *aff'd*, 904 F.2d 45, 1990 WL 62180 (Fed. Cir. 1990) (table)); *Kellogg Brown & Root Servs., Inc. v. United States*, 99 Fed. Cl. 488, 514 (2011).  Under another line of cases, the Government needs to prove: (1) misrepresentation of a material fact, (2) intent to deceive or a state of mind so reckless respecting consequences as to be the equivalent of intent (scienter).  *Crane Helicopter Servs., Inc.,* 45 Fed. Cl. at 430 n.25 (citing *Young-Montenay, Inc.*, 15 F.3d at 1042, and *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998), 40 GC ¶ 471).

As the Supreme Court has noted:

The False Claims Act abrogates the common law in certain respects. For instance, the Act's scienter requirement 'require[s] no proof of specific intent to defraud.' 31 U.S.C. § 3729(b)(1)(B).  But we presume that Congress retained all other elements of common-law fraud that are consistent with the statutory text because there are no textual indicia to the contrary.  *Neder v. United States*, 527 U.S. 1, 24-25 (1999).

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 n.2 (2016).

Therefore, for purposes of this Memorandum and Order, this Court selectively relies on FCA and FFCA precedent only to the extent it informs this Court's analysis at the Motion to Amend stage.

1.   Defendant Has Adequately Pleaded that Square One Made a Misrepresentation
     of Material Fact.

Defendant has adequately alleged the first and second elements of a material false statement, with its assertions that Plaintiff charged DOS $82,357.41 for job 438, 439, 440, and 441 when it should have only charged $50,940 for each job.  *See* Proposed Am. Answer ¶ 72.  Plaintiff does not contest that these allegations do not meet the first and second elements of common law fraud, and courts have found that similar allegations are sufficient to meet the pleading requirements.  *See e.g.*, *Tyger Constr. Co.*, 28 Fed. Cl. 35, 58 (1993) (finding, in the False Claims Act context, that a contractor allegedly charging for work it did not perform was an issue of fact that was inappropriate to resolve at the motion to dismiss stage).[12]

2.   Defendant Has Adequately Pleaded Scienter.

Defendant has adequately alleged the third element—scienter.   In its Proposed Counterclaim, Defendant points to internal communications among Square One employees which took place both before and after false invoices were sent, which, if true, would tend to indicate that Square One was aware that the invoices for jobs 438-441 were false.  *See e.g.,* Proposed Am. Answer ¶¶ 71 (asserting that a March 20, 2008  communication between Ms. Guillen-Ramos, Mr. Quintana, Mr. Martin Cardenal, Mr. Julio Cardenal, and several other persons, acknowledges that jobs 438-441 were armored pursuant to GSA specifications); 78 (asserting that an August 31, 2009 email among Square One employees acknowledges that Square One overcharged DOS for jobs 438-441).  Defendant further bolsters its allegations related to scienter with its assertions that prior to sending the allegedly false invoices, Plaintiff sent multiple invoices for the same work which indicated that jobs 438-441 were in fact performed pursuant to the GSA Contract.  *See id.* ¶¶ 73,

---

[12] The False Claims Act is informed by common law fraud principles of materiality.  *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016).

75-76.  Additionally, Defendant suggests that Plaintiff's scienter is further demonstrated by its interactions with Mr. Motley to conceal the alleged overcharges associated with jobs 438-441 in exchange for supplying Mr. Motley with a Chevrolet Suburban associated with job 450.  *Id.* ¶¶ 81-105.  Defendant asserts that Square One knew that the Government had not, in fact, ordered the Chevrolet Suburban associated with job 450 because Plaintiff never received a purchase order for the vehicle.  *Id.* ¶ 102.  Defendant alleges that, to avoid scrutiny of its other invoices, Plaintiff never pressed the DOS contracting officer for a purchase order or informed the contracting officer of the irregularities surrounding job 450.  *Id.* ¶ 107.  These allegations, if taken as true, tend to show that Square One acted in concert with Mr. Motely to deceive DOS with respect to jobs 438, 439, 440, 441, and 450.  Finally, according to Defendant, Mr. Quintana's 2014 statements to investigators, which he recanted in 2020, further demonstrate an intent to deceive the Government as to the work performed by Plaintiff for jobs 438, 439, 440, and 441.  *Id.* ¶ 108.

Plaintiff does not argue that these allegations fail to meet rule 9(b)'s pleading requirements with respect to scienter.  Instead, Plaintiff argues that Defendant cannot prove an "intent to deceive" because the contracting officer's October 13, 2020 final decision asserted that Square One submitted the invoices for jobs 438, 439, 440, and 441 in good faith.  Pl. Resp. at 7.  However, the contracting officer's determination of good faith is irrelevant because the contracting officer has no authority to decide a claim involving suspected fraud.  41 U.S.C. § 7103(c); *see also Martin J. Simko Const., Inc. v. United States*, 852 F.2d 540, 548 (Fed. Cir. 1988) (contracting officers cannot make determinations based on fraud).  Therefore, the contracting officer's October 13, 2020 final decision has no bearing on Defendant's common law fraud counterclaim.

Defendant's detailed allegations identify with specificity the parties involved and the time when these communications took place.  Though many factual issues are still outstanding,

Defendant's allegations as to scienter have met Rule 9(b)'s pleading requirements.  And at this stage, the proper inquiry is whether the proposed amendment would survive a motion to dismiss, not whether a proposed amendment would succeed on the merits.  *See Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States*, 71 Fed. Cl. 172, 176 (2006) ("A motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss.") (citation omitted).  Accordingly, this court cannot find that the contracting officer's October 13, 2020 final decision render's Defendant's Proposed Counterclaim futile.

3.  <u>Defendant Has Adequately Pleaded Justifiable Reliance.</u>

In support of showing reliance, the claim's fourth element, Defendant alleges that DOS actually paid the allegedly fraudulent invoices.  *See* Proposed Am. Answer ¶ 69.  Through the actual payment of this invoice, Defendant has plausibly established that it relied on the allegedly fraudulent representations made in the invoices for jobs 438-441.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1295 (Fed. Cir. 2011) ("[common law] fraud requires that the party 'relies on the misrepresentation in acting or refraining from action'") (quoting Restatement (Second) of Torts § 525 (1977)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (finding, in the RICO context, that "[i]n cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed").

Plaintiff does not appear to dispute that DOS actually paid the invoices for jobs 438-441.  Plaintiff argues that Defendant cannot meet the pleading requirements for justifiable reliance because the invoices were prepared at the direction of DOS and its agents.  Pl. Resp. at 7.  However, Defendant alleges that the Government did not have knowledge of falsity of the invoices for jobs 438-441, in part, because Plaintiff acted at the direction of Mr. Motley, who himself was part of

the allegedly fraudulent scheme.  *See* Proposed Am. Answer ¶¶ 82-107.  While defenses may exist to the extent Plaintiff contends it acted at the direction of DOS agents other than Mr. Motley, Defendant has made a facially plausible case that the Government overpaid Plaintiff in reliance on Plaintiff's allegedly false invoice for purposes of its Proposed Counterclaim.  *See LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 284-85 (2018) (rejecting plaintiff's argument that the government cannot prove the justifiable reliance element of its common law fraud claim even where the government had reason to know plaintiff's representations were inaccurate); *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 264 (5th Cir. 2014) (in the False Claims Act context, "[t]he government knowledge defense is not appropriate at the motion to dismiss stage, which requires us to draw all inferences in favor of the United States.").

Accordingly, although questions of whether the government justifiably relied on Square One's Invoices remain open, it would be inappropriate for the Court to deny Defendant leave to amend based on these open questions at this stage of the litigation.  *Tyger Const. Co. Inc. v. United States*, 28 Fed. Cl. 35, 59 (1993) (allegations of whether the government's knowledge impacts its ability to prove reliance does not foreclose the government from proceeding with its fraud counter claim).

    4.   <u>Defendant Has Adequately Pleaded Injury Resulting from Reliance on the Misrepresentation.</u>

Finally, in support of the claim's fifth element—injury—Defendant alleges that the false representations in Plaintiff's invoices caused DOS to overpay Plaintiff by $125,669.64.  *See* Proposed Am. Answer ¶ 70.

Plaintiff argues that the "injury" element to common law fraud is disproved by Plaintiff's internal accounting.  Pl. Resp. at 7.  This ultimately may be true; but, at this stage, the Court must assume the facts in Defendant's Proposed Counterclaim are true.  *See Jasmine Int'l Trading &*

*Servs., Co. W.L.L. v. United States*, 120 Fed. Cl. 577, 584 (2015) ("At the pleading stage, the salient inquiry is not whether Defendant is likely to prevail on the merits, but instead whether it is entitled to offer evidence in support of its counterclaim." (citing *Chapman Law Firm Co. v. Greenleaf Constr. Co., Inc.,* 490 F.3d 934, 938 (Fed. Cir. 2007))).  Assuming for purposes of this motion that Defendant's allegations are true, the overpayment of funds attributable to an allegedly false invoice is a cognizable injury and Defendant is entitled to proceed with a counterclaim in common law fraud that seeks to recover this overpayment.  *See K & R Eng'g Co. v. United States*, 616 F.2d 469, 476 (Ct. Cl. 1980) (finding the government may recover amounts already paid to contractor if those amounts were paid under false pretenses).

In sum, Defendant has alleged "enough facts to state a claim to relief that is plausible on its face; it has nudged [its] claims across the line from conceivable to plausible." *ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 986 (Fed. Cir. 2014) (quotations omitted) (citing *Twombly*, 550 U.S. at 570).  While this Court cannot and should not decide at this stage whether Defendant will ultimately prevail on its common law fraud counterclaim, the Court can safely determine that Plaintiff's concerns do not render Defendant's counterclaims futile.

### B.  Defendant's Counterclaims Are Not Barred by the Statute of Limitations.

Similarly, Plaintiff's statute of limitations concerns do not render Defendant's Proposed Counterclaim futile.  To support its assertion, Plaintiff cites 28 U.S.C. § 2416 which states, "[f]or the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which . . . (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  Pl. Resp. at 6.

However, 28 U.S.C. § 2415(f) supplies the correct standard where a counterclaim for common law fraud arises from the same contract that serves as the basis for plaintiff's timely

complaint.  Under section 2415(f), any such counterclaim for common law fraud satisfies the statute of limitations.  *See Rhoades*, 222 Ct. Cl. 611, 613 (1980) (finding common law fraud counterclaims are governed by 28 U.S.C. § 2415(f) to the extent the counterclaim arises out of the same incidents giving rise to a plaintiff's timely claim); *LW Construction of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 284 (2018) (same).  It cannot be seriously disputed that the four invoices at issue in Defendant's Proposed Counterclaim stem from the same transaction underlying Plaintiff's Third Amended Complaint.  Accordingly, Defendant's counterclaims are not barred by the statute of limitations.

C.  Rule 13(a) Does Not Bar Defendant's Common Law Fraud Counterclaims.

Third, Plaintiff's reliance on Rule 13(a) is inapposite.  Rule 13(a), which outlines the rules for compulsory counterclaims, is meant to prevent separate actions from the same transaction or occurrence.  *See S. Const. Co. v. Pickard*, 371 U.S. 57, 60 (1962)  ("The requirement that counterclaims arising out of the same transaction or occurrence as the opposing party's claim 'shall' be stated in the pleadings was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters.).  "The Rule was particularly directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint."  *Id.* at 60 (citation omitted).  That is simply not the case here.  Moreover, the compulsory nature of Defendant's Proposed Counterclaim actually counsels in favor of allowing amendment.  *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 802 (Fed. Cir. 1999) (finding "[compulsory] counterclaim[s] ordinarily should not be refused entry").

II.  <u>Defendant's Proposed Counterclaim Was Made Without Undue Delay or Bad Faith and Will Not Unduly Prejudice Plaintiff.</u>

Plaintiff also argues that this Court should deny Defendant leave to amend because Defendant's counterclaim was made in bad faith, was untimely, and unduly prejudices Plaintiff. *See* Pl. Resp. at 2-8.  For the reasons explained below, each of these arguments is without merit.

A.  <u>No Evidence that Defendant Made its Proposed Counterclaim in Bad Faith.</u>

Plaintiff posits that Defendant is seeking to add its counterclaim in bad faith and cites to Defendant's attempts to re-depose Ms. Guillen-Ramos, and the Department of Justice Civil Frauds Section's declination to bring a false claims act case against Square One.  Pl. Resp. at 7-8.

However, determining whether bad faith exists is a factual inquiry, and nothing currently in the record reflects that Defendant is acting in bad faith here.  *See Hanover Ins. Co.*, 134 Fed. Cl. at 61 (considering that plaintiff opposing defendant's leave to amend could "not provide any factual support for its argument regarding defendant's motive," the court could not find that the amendment was brought for an improper purpose).  As stated in *LW Constr. of Charleston, LLC*, 139 Fed. Cl. at 308, "[t]he defendant also has a responsibility not to condone paying for and rewarding a contractor which may have committed fraud and to recover funds improperly paid to any such contractor."  Here, the current record before this Court reflects that Defendant is merely being diligent in attempting to recover funds it believes are owed to the United States.

Without evidence to the contrary, this Court cannot find that Defendant's Proposed Counterclaim was made in bad faith.

B.  <u>Defendant's Proposed Counterclaim Will Not Unduly Prejudice Plaintiff.</u>

Next, Plaintiff argues that Defendant's Proposed Counterclaim will prejudice Plaintiff by expanding the scope of discovery, requiring redeposition of witnesses previously deposed, and ultimately delaying the resolution of this action.  *Id*. at 8.

Plaintiff's concerns, however, do not amount to undue prejudice.   "[I]n order to successfully assert *undue prejudice* as a justification for denying a Rule 15 motion, the non-movant *must* demonstrate that one of the following circumstances will result: severe disadvantage or inability to present facts or evidence; necessity of conducting extensive research *shortly before trial* due to the introduction of new evidence or legal theories; or excessive delay that is *unduly* burdensome."   *St. Paul Fire & Marine Ins. Co.*, 31 Fed. Cl. at 153 (emphasis in original) (internal quotations omitted).   "Mere annoyance and inconvenience[,] . . . however, are insufficient bases to warrant a denial of a motion to amend."   *Id.* (emphasis in original) (internal quotations omitted)*; see also Meyer*, 115 Fed. Cl. at 649 ("[U]ndue prejudice [exists] where amending a pleading would result in unfair surprise, unreasonably expand the issues or necessitate the need for additional discovery . . . [or] when the amendment would prevent the non-movant from adequately responding to the new claims." (citations omitted)).   The party invoking prejudice as a defense carries the burden of its demonstration.   *Veridyne Corp. v. United States*, 86 Fed. Cl. 668, 681 (2009).

Defendant's Proposed Counterclaim is unlikely to drastically increase the scope of discovery because the common law fraud counterclaim arises from the same DOS Contract that serves as the basis for Plaintiff's Third Amended Complaint.   *See Northrop Grumman Sys. Corp. v. United States*, 137 Fed. Cl. 677, 685 (2018) (finding no prejudice when proposed amendments "do not fundamentally change or unduly broaden the issues"); *cf. Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1364 (Fed. Cir. 2013) ("[I]f the amendment . . . substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial." (quoting Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2013)).   Further, this case does

not yet have a trial date set, and discovery is currently ongoing.  Therefore, the counterclaim is unlikely to have an impact on the parties' current schedule.  *See Katzin v. United States*, 115 Fed. Cl. 618, 621 (2014) (finding no undue prejudice where the non-moving party had an "opportunity to conduct additional fact discovery between the time this motion was filed and the scheduled close of fact discovery . . .").  Indeed, in its reply brief, Defendant represented to the Court that it can complete its discovery under the current schedule.  Def. Reply at 18.  Specifically, Defendant plans to depose both Mr. Martin Cardenal, whom Defendant planned to depose prior to the Proposed Counterclaim, and Ms. Guillen-Ramos within the existing discovery schedule.  *Id*.  Aside from its attempt to re-depose Ms. Guillen-Ramos, Defendant's Proposed Counterclaim appears to place little, if any, additional discovery burden on Plaintiff.  *See Hanover Ins. Co.*, 134 Fed. Cl. at 63 (allowing amendment when "additional discovery required is neither substantial nor burdensome because it is limited in scope and can take place concurrently with ongoing discovery").

For these reasons, the Court concludes that—while Plaintiff may be inconvenienced by Defendant's Proposed Counterclaim—it will not be unduly prejudiced by it.

## C. Defendant Did Not Act With Undue Delay.

Finally, Plaintiff argues that Defendant's Proposed Counterclaim is untimely because it is based, in part, on invoices submitted in 2008 and 2009 and information that was in the possession of DOS's Office of Inspector General since 2012.  *See* Pl. Resp. at 2-4.  Plaintiff argues, therefore, that Defendant unduly delayed the assertion of its counterclaims.  *Id*. at 3-4 (citing *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States,* 948 F.2d 1258, 1263 (Fed. Cir. 1991)).

Defendant contends that "[t]he State Department received the false invoices in 2008 and 2009 as requests for payment but had no way of knowing that those invoices were false at that time."  Def. Reply at 8.  Addressing Plaintiff's allegation that Defendant's Motion is untimely, Defendant avers that the General Services Administration (GSA) Office Inspector General (OIG)

reviewed the referenced 2012 document production and not DOS OIG, as Plaintiff states.  *Id*. Regardless, Defendant avers that DOJ, the relevant government entity for purposes of this motion, did not see the noted document production in 2012.  *Id*.  Defendant admits that, in 2014, it had general knowledge of potential problems with Plaintiff's 2008 and 2009 invoices but states that the basis for Defendant's fraud counterclaim could not be reasonably assessed until DOJ received Square One's June 22, 2020 production and deposed Mr. Quintana in August 2020.  Def. Reply at 8-10.

In determining whether delay warrants the denial of leave to amend, the court may consider whether the moving party's delay was justified under the circumstances.  *See Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1365 (Fed. Cir. 2013) (citing 6A Charles Alan Wright et al., Federal Practice and Procedure § 1510, at 208-09 (2d ed.1990) (noting that "supplemental pleading will not be permitted" where "the moving party is guilty of inexcusable delay")).

Defendant has provided an adequate explanation for its delay in bringing its Motion to Amend.  Defendant explains that DOJ's first exposure to the allegedly fraudulent invoices occurred in January 2014, when a DOJ attorney attended an interview of Mr. Quintana conducted by a GSA OIG.  *Id.* at 8-11.  At the interview, Mr. Quintana was asked about the invoices for four (4) cars that Square One had provided to DOS in August 2009 because GSA OIG was concerned that Square One had charged DOS prices that did not appear on the GSA Contract.  *Id.* at 8-10. During the interview, Mr. Quintana explained that the GSA Contract called for ballistic protection, but Square One instead delivered the four vehicles at issue with blast protection because DOS had instructed Square One to do so.  *Id.* at 9-10.  Mr. Quintana further explained that blast protection required more labor that ballistic protection and, therefore, Square One charged DOS a higher

price for blast protection.  *Id.* at 10-11.  Mr. Quintana's testimony appeared to indicate that DOS ultimately paid Square One for blast protection work.  *Id.* at 10.

Subsequently in 2019, after extensively reviewing "inspection packets" during discovery for this case, DOJ came to the believe that Mr. Quintana's 2014 testimony may have been incorrect.  *Id.* at 4.  According to Defendant, the "inspection packets" revealed that Square One had not, in fact, provided DOS with "blast protection cars" for the four invoices discussed during the 2014 interview.  *Id.* at 4, 10-11.  Though DOJ had access to these inspection packets in 2014, counsel for Defendant explained that the volume and complexity of the documents made it difficult to ascertain the falsity of Mr. Quintana's testimony any earlier.  *Id.* at 4 (describing the inspection packets as an "unwieldy collection of technical documents").  Shortly after learning that Mr. Quintana's 2014 testimony was potentially false, DOJ attempted to depose Mr. Quintana, but the deposition was rescheduled multiple times.  *See id.* at 4-6.

Then, on June 22, 2020, Plaintiff produced documents in response to Defendant's document requests concerning a conversation between Mr. Motley and Ms. Guillen-Ramos about the Chevrolet Suburban eventually owned by Mr. Motley's wife.  *Id.* at 6-8.  According to Defendant, these documents evidence an effort to conceal the allegedly fraudulent invoices and demonstrate that Plaintiff treated the four cars in the August 2009 deal "in a clandestine fashion in the years following 2009 . . . ."  *Id.* at 6.

In August 2020, Defendant's counsel deposed Mr. Quintana.  *See id.* at 7, 9.  When presented with 2008 work orders and 2009 invoices at his deposition, "Mr. Quintana confirmed that the four invoices referenced in the August 2009 email sought payment for 'old contract,' [i.e., ballistic protection], work at 'new contract,' [i.e., blast protection], prices."  *Id.* at 9.  According to Defendant, DOJ had no reason to suspect that Square One's August 2009 invoices were fraudulent

until after Square One's June 22, 2020 production and Mr. Quintana's August 2020 deposition. *Id.* at 6, 9-11.

After the deposition, Defendant's counsel internally sought authority to assert a fraud counterclaim, which required coordination with and approval from multiple divisions and supervisors within the DOJ.  *Id.* at 7.  On September 28, 2020, Defendant's counsel received approval from his supervisors to assert a common law fraud counterclaim, and promptly filed the present motion.  *Id.*

Plaintiff relies on *Te-Moak Bands* for the proposition that a significant delay alone warrants the denial of Defendant's motion for leave to amend.  *See* Pl. Resp. at 3.  Plaintiff's argument misses the point.  In *Te-Moak Bands*, the plaintiffs brought a takings claim and an accounting claim before the Indian Claims Commission in August 1951.  948 F.2d at 1259 (Fed. Cir. 1991). In 1957, the Commission severed the accounting claim from the takings claim.  *Id*.  The GSA filed its accounting report in response to the petition in 1968.  *Id*.  In 1969 and 1973, the plaintiffs filed two sets of exceptions to the GSA report.  *Id*.  On June 29, 1982, the plaintiffs filed additional exceptions to the GSA accounting report, and on October 7, 1982, the case was transferred to the Claims Court.  *Id*.  In 1987, the defendant moved to dismiss the some of the exceptions the plaintiffs filed in 1982.  *Id.* at 1260.  The United States Court of Appeals for the Federal Circuit (Federal Circuit) held the plaintiffs' 1982 exceptions were untimely because the plaintiffs had possession of the information underlying its 1982 exceptions in 1974, and nothing in the record had changed from 1974 to 1982.  *Id.* at 1262-63.  Moreover, the Federal Circuit held that the delay was the result of a "breakdown in the relationship between the [plaintiffs] and their counsel," and thus solely the fault of the plaintiffs.  *Id*. at 1263.  Thus, *Te-Moak Bands* counsels that it is appropriate to deny leave to amend where the record has remained static, and amendments are

based on information that were within a moving party's possession for a significant period of time. *Id.*

Conversely, where new information is discovered during the course of discovery, courts routinely have permitted amendments even where the moving party had previous general knowledge of the basis of the proposed amendments. *Hanover Ins. Co.*, 134 Fed. Cl. at 61 (permitting amendment where "facts suggesting fraud were not uncovered until after discovery began. . . ."). For example, in *LW Construction*, the court granted the defendant's 2017 motion for leave to amend its answer to assert a counterclaim based on common law fraud even though the DOJ had notice of the suspected fraud in 2014. In that case, the alleged fraud involved a false certification that the company was owned and controlled by a service-disabled veteran at the time the contract was awarded in 2009. *LW Constr.*, 139 Fed. Cl. at 264-66. In May 2014, one of the company's subcontractors filed a *qui tam* suit against the company, alleging that the company had falsely certified its status to obtain the contract. *Id.* at 270-71. The DOJ learned about the *qui tam* filing in 2014 and started a criminal fraud investigation but never filed charges. *Id.* at 271-73. When the company filed suit in the United States Court of Federal Claims in October 2014, the Government did not file a counterclaim based on fraud. *Id.* at 273. However, after conducting depositions and reviewing documents previously provided to the United States Department of Veterans Affairs' OIG in 2011, the DOJ began to suspect that fraud had occurred. *Id.* In 2017, after the plaintiff refused to provide documents related to the suspected fraud, the defendant began to seek approval from DOJ supervisors to bring a fraud counterclaim. *Id.* The approval process was complete, and the counterclaim was filed on October 13, 2017, two years and ten months after the defendant filed its initial answer. *Id.* at, 303-04. The Court held that there was no undue delay

where the defendant reassessed its position on fraud as discovery progressed.  *Id*. at 303-04, 308-09.

Unlike in *Te-Moak Bands*, Defendant's Proposed Counterclaim is based on newly discovered evidence which was not within Defendant's control.  *See* Def. Reply at 6, 9-11.  As Defendant explained, although it had access to "inspection packets" in 2014, DOJ was unaware of the potential falsity of Mr. Quintana's testimony until 2019.  *Id*. at 9-11.  At that time, Defendant sought to depose Mr. Quintana, but was unable to do so immediately due to events beyond its control.  Def. Reply at 4-6.  The DOJ continued to diligently investigate potential fraud and Plaintiff did not provide Defendant with previously undisclosed evidence until July 22, 2020.  *See* Def. Reply at 6.  When DOJ was finally able to depose Mr. Quintana in August 2020, Mr. Quintana's 2020 testimony allegedly differed from his testimony offered during the 2014 GSA OIG investigation.  *Id*. at 7-9.  Thus, evidence that was not supplied until the summer of 2020 contributed significantly to DOJ's decision to pursue a common law fraud counterclaim.  *Id*. at 3-5.

In this way, the facts in the case at bar are almost identical to the facts in *LW Construction*.  Like the defendant in *LW Construction*, even though the general subject matter underlying Defendant's newly asserted fraud counterclaim was technically known to DOJ as early as 2014, Square One's June 22, 2020 production and Mr. Quintana's August 2020 deposition provided the Defendant with crucial evidence which was not previously within DOJ's possession.  Def. Reply at 9-10.

Accordingly, this Court finds that Defendant did not act with undue delay in seeking leave to amend its Answer.

CONCLUSION

For the reasons set forth herein, this Court **GRANTS** Defendant's Motion for Leave to File Defendant's Second Amended Answer to the Third Amended Complaint, and Defendant's Counterclaims, Set-off and Affirmative Defenses (ECF No. 149) (Second Amended Answer and Counterclaim).  Defendant shall file its Second Amended Answer and Counterclaim within three (3) days of this Memorandum and Order.


IT IS SO ORDERED.


                                        s/ Eleni M. Roumel
                                     ELENI M. ROUMEL
                                        Chief Judge

Dated: February 22, 2021
Washington, D.C.